1

```
1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - - - x

4    JOHN J. CHAPMAN,            :

5              Plaintiff,    : Civil Action No.

6          vs.                :   3:03CV316

7    EXPERIAN INFORMATION       :     (JCH)

8    SERVICES, INC., CHASE      :

9    MANHATTAN BANK USA, N.A.,   :

10             Defendant.      :

11   - - - - - - - - - - - - - x

12

13

14              Deposition of JOHN J. CHAPMAN, taken

15        pursuant to the Federal Rules of Civil

16        Procedure at the offices of Sanders, Gale &

17        Russell, 437 Orange Street, New Haven,

18        Connecticut, before Elizabeth A. Zawacki, LSR

19        #00087, a Registered Merit Reporter and Notary

20        Public in and for the State of Connecticut, on

21        Tuesday, February 24, 2004, at 10:08 a.m.

22

23

24

25
```

SANDERS, GALE & RUSSELL
1-800-824-4541

2

```
1   A P P E A R A N C E S:

2

3       For the Plaintiff:

4           JOANNE S. FAULKNER, ESQ.

5           123 Avon Street

6           New Haven, Connecticut 06511-2422

7       For the Defendant Experian Information

8       Services, Inc.:

9           JONES DAY

10          222 East 41st Street

11          New York, New York 10017

12          BY:  ALBERT J. ROTA, ESQ.

13      For the Defendant Chase Manhattan Bank USA,

14      N.A.:

15          SIMMONS, JANNACE & STAGG

16          The Financial Center

17          90 Merrick Avenue, Suite 102

18          East Meadow, New York 11554

19          BY:  THOMAS E. STAGG, ESQ.

20              ANDREW KAZIN, ESQ.

21

22      Also present:

23      Greg Jacques, Videographer, Geomatrix

24        Productions

25
```

SANDERS, GALE & RUSSELL
1-800-824-4541

3

```
 1                    (Chapman Deposition Exhibits 1

 2              through 4 marked for identification.)

 3                    THE VIDEOGRAPHER:  We are now on

 4    record at 10:08.  This is the deposition of John J.

 5    Chapman, recorded on February 24, 2004, New Haven,

 6    Connecticut.  This deposition is being taken in the

 7    case of John J. Chapman versus Experian Information

 8    Services, Incorporated, Chase Manhattan Bank USA,

 9    N.A., and was noticed on behalf of the defendant.

10                    My name is Greg Jacques, videotape

11    operator, of Geomatrix Productions, 270 Amity Road,

12    New Haven, Connecticut.

13                    Are there any stipulations?

14                    MR. STAGG:  No.

15                    THE VIDEOGRAPHER:  If counsel would

16    all introduce themselves, please.

17                    MS. FAULKNER:  Joanne Faulkner for

18    the plaintiff, Mr. Chapman.

19                    MR. STAGG:  Thomas Stagg for Chase

20    Manhattan Bank USA, N.A.

21                    MR. KAZIN:  Andrew Kazin for Chase.

22                    MR. ROTA:  Albert J. Rota for

23    Experian Information Solutions, Inc.

24                    THE VIDEOGRAPHER:  The witness may be

25    sworn in.
```

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

4

```
 1   J O H N    J.    C H A P M A N ,

 2   of 26 Bluff Road West, Gales Ferry, Connecticut

 3   06335,

 4       called as a witness, being first duly sworn by

 5       Elizabeth A. Zawacki, a Notary Public within

 6       and for the State of Connecticut, was examined

 7       and testified under oath as follows:

 8   DIRECT EXAMINATION

 9   BY MR. STAGG:

10       Q.    Mr. Chapman, I show you what's been marked

11   as Deposition Exhibit Chapman 1.  Do you recognize

12   that document, sir?

13       A.    Yes, sir, I do.

14       Q.    What is it?

15       A.    This is a letter received from Chase

16   notifying me that the bankruptcy that was found in

17   my credit file would be deleted.

18       Q.    And what's the date of that letter?

19       A.    The date of this letter is November 25,

20   2002.

21       Q.    Thank you.

22            Sir, I hand you what's been marked as

23   Chapman Exhibit 2 for identification.  Do you

24   recognize that document, sir?

25                 MS. FAULKNER:  Mr. Stagg?
```

1                    MR. STAGG:  I'm sorry.

2                    (Handed.)

3       A.    Yes, sir, I do.

4       Q.    What is that?

5       A.    This was sent to me after a hard copy

6  letter and a faxed copy letter of the same was

7  provided to me indicating that Chase had made an

8  error, and that the bankruptcy that was listed would

9  be removed, and after I thought that those

10  catastrophic items were put to rest, I received this

11  that was written on Christmas Day and received

12  shortly thereafter.

13      Q.    What year is that?

14      A.    I'm not certain if I received it at the

15  very end of 2002, or if I received it in January.  I

16  believe it was January of 2003.

17      Q.    The letter is dated December 25, 2002, is

18  it not?

19      A.    Yes, sir.

20      Q.    And in the letter, does Chase explain why

21  it is or was reducing your credit on the account to

22  $3,000?

23      A.    If I may, Mr. Stagg, I think that it gives

24  reasons here.  I don't know that it shows, that it

25  gives reasons to me individually that would indicate

SANDERS, GALE & RUSSELL
1-800-824-4541

6

1     a garnishment, foreclosure, lien, repossession,

2     judgment or bankruptcy.

3         Q.    Let's go through in the second paragraph,

4     sir, where it states:

5             "As a result of information obtained on

6     your credit report, effective December 25, 2002 the

7     line of credit on your Chase credit card account

8     will change to $3,000 for the following reasons,"

9     and it sets forth two reasons.  "The consumer credit

10    report we received shows a recent delinquency,"

11    that's the first, and the second is, "The consumer

12    credit report we received shows a recent

13    garnishment, foreclosure, lien, repossession,

14    judgment and/or bankruptcy."

15            Correct?

16        A.    That is correct.  That's what it

17    indicates.

18        Q.    Further down on the same page of this

19    exhibit it states, I believe it's the fourth

20    paragraph, "Our decision was based in whole or in

21    part on the information obtained from the consumer

22    reporting agency listed below."

23            Do you see that, sir?

24        A.    Yes, I do.

25        Q.    And it references Experian as the consumer

SANDERS, GALE & RUSSELL
1-800-824-4541

7

1  reporting agency, does it not?

2      A.     Yes, it does, sir.

3      Q.     It also states under the Fair Credit

4  Reporting Act you have a right to obtain a free copy

5  of your consumer report from the consumer reporting

6  agency listed in the letter, which was Experian,

7  right?

8      A.     Correct.

9      Q.     And that you may make a request in writing

10  within 60 days from the date listed above, which was

11  December 25, 2002, right?

12      A.     Yes.

13      Q.     It also states that you have the right to

14  dispute with the consumer reporting agency the

15  accuracy or completeness of any information in a

16  consumer report furnished by the agency, right?

17      A.     Yes.

18      Q.     And you recall receiving that letter, as

19  you said, late 2002 or early 2003?

20      A.     Yes, sir, I do.

21      Q.     And with respect to the prior exhibit we

22  looked at, Chapman Exhibit 1, you recall receiving

23  that on or about November 25, 2002, right?  That's

24  the date of the letter.

25      A.     Shortly thereafter, yes.

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

8

1    Q.    Sir, is it your contention in this lawsuit

2  that Chase failed to conduct a reasonable

3  investigation with regard to a dispute that you

4  lodged with a consumer reporting agency?

5              MS. FAULKNER:  Objection.  Calls for

6  a legal conclusion.

7    Q.    You can answer.

8              MS. FAULKNER:  If he's a lawyer, he

9  can answer.

10              MR. STAGG:  Are you instructing the

11  witness not to answer the question?

12              MS. FAULKNER:  That is not a proper

13  question, so you can ask him a different way

14  perhaps.

15              MR. STAGG:  I'm asking are you

16  instructing the witness not to answer the question?

17              MS. FAULKNER:  What was the question?

18              MR. STAGG:  Can you read it back,

19  please.

20              (Question read.)

21              MS. FAULKNER:  I will again object to

22  it as vague and overbroad.

23    Q.    You can answer the question.

24              MS. FAULKNER:  I don't think so, not

25  the way it's posed.

SANDERS, GALE & RUSSELL
1-800-824-4541

1     Q.     Sir, do you understand the question?

2     A.     Yes.

3     Q.     Please answer it.

4     A.     (No response.)

5     Q.     I would ask that you not look to your

6     lawyer for guidance.

7                   MS. FAULKNER:  I don't think he

8     understands the question.  Would you --

9                   MR. STAGG:  He already said he does.

10    Let's let the witness explain.

11    A.     I understand the gist of the question

12    you've asked, Mr. Stagg.  I don't know that without

13    a legal background that I'm prepared to answer the

14    legal tone or the legal insinuation of that

15    question.

16    Q.     Sir, do you have any evidence to support a

17    claim that Chase failed to investigate a dispute

18    with regard to the credit card at issue in this

19    case?

20                  MS. FAULKNER:  Once again, this is

21    a -- this calls for a legal conclusion on the part

22    of the witness.  It is also vague and overbroad.

23    Q.     Did you understand the question?

24    A.     Again, I understand the question, but I

25    think that there's a legal overtone there that I'm

SANDERS, GALE & RUSSELL
1-800-824-4541

10

1    uncomfortable in answering without guidance.

2        Q.    Sir, I call your attention to paragraph 17

3    of your complaint filed in this action wherein you

4    state:

5            "Upon information and belief, each

6    defendant violated the FCRA," which I take it to

7    mean Fair Credit Reporting Act, "by failing or

8    refusing to comply with the obligation to properly

9    reinvestigate the plaintiff's disputes or correct

10   his reports."

11           With respect to Chase, what's the basis of

12   that allegation?

13       A.    May I --

14       Q.    Of course.

15       A.    We are looking at number --

16       Q.    17.

17           MS. FAULKNER:  Why don't we short

18   circuit this.  With regard to this matter, this

19   case, discovery has shown that Experian did not

20   communicate with Chase.  Therefore, that claim is no

21   longer in this case.  This case.

22           MR. STAGG:  So there's a stipulation

23   that that claim has been withdrawn in this case?

24           MS. FAULKNER:  I think I told you

25   that months ago.

11

```
 1              MR. STAGG:  I just want to be clear.
 2    Is that correct?
 3              MS. FAULKNER:  Yes, that's correct;
 4    and we can also stipulate that he got those letters
 5    and what the contents are.  So let's move along.
 6       Q.    Sir, I hand you what's been marked as
 7    Chapman Exhibit 3 for identification.  Do you
 8    recognize that document, sir?
 9              MS. FAULKNER:  We will stipulate that
10    that is a document that he received, and we'll
11    stipulate that the contents say what they say.
12       Q.    Do you recall receiving that, sir?
13       A.    Yes, I do, sir.
14       Q.    On or about January 14, 2003, right?
15       A.    Written on January 14, 2003.  I don't
16    recollect exactly when I received it.  Shortly
17    thereafter I would suppose.
18       Q.    With respect to Chase, sir, what actual
19    damages are you claiming in this case?
20              MS. FAULKNER:  Objection as to a
21    legal question.
22              MR. STAGG:  Are you instructing the
23    witness not to answer?
24              MS. FAULKNER:  That is a legal
25    question.
```

SANDERS, GALE & RUSSELL
1-800-824-4541

12

1              MR. STAGG:  We can go around, round

2      and round on this.  Are you instructing witness not

3      to answer the question?  I'm asking him what his

4      actual damages are.  In my opinion, that's not a

5      legal question.  I'm asking him the factual basis

6      with regard to his damages.

7              MS. FAULKNER:  Why don't you ask that

8      question.

9              MR. STAGG:  I did.

10              MS. FAULKNER:  No.

11      Q.    Sir, did you understand the question?

12      A.    Again, Mr. Stagg, I'm happy to answer any

13      question that you have.  My contention is that if

14      there's a legal overtone to the question, I'm

15      uncomfortable in answering it definitively because I

16      am not a lawyer and I don't have a true

17      understanding of the law that surrounds it.  If you

18      can extract something from that question and put it

19      in more simplistic terms, without a legal overtone,

20      I would be very happy to answer it.

21      Q.    Are you alleging damages in this case,

22      sir?

23      A.    Yes, sir.

24      Q.    What damages are you alleging against

25      Chase?

SANDERS, GALE & RUSSELL
1-800-824-4541

1              MS. FAULKNER:  The allegations are in

2    my bailiwick.  That's a legal question.

3              MR. STAGG:  Just so we are clear on

4    this, it's your position that my request to ask this

5    witness what damages he suffered is a legal

6    question?

7              MS. FAULKNER:  Yes.

8              MR. STAGG:  Are you instructing the

9    witness not to answer?

10             MS. FAULKNER:  You already have his

11   answers in written discovery, which is the proper

12   way to get those questions.  So if you want to go

13   over the written discovery, you may.

14             MR. STAGG:  I disagree, Attorney

15   Faulkner, and I'm entitled to probe the damages that

16   this witness alleges that he suffered in this case.

17       Q.    Sir, now answer the question, please.

18   What damages have you suffered --

19             MS. FAULKNER:  That is a vague --

20       Q.    -- as pertains to Chase?

21             MS. FAULKNER:  -- overbroad and a

22   legal question.

23             MR. STAGG:  If I don't get an answer

24   to this question, I will move today to strike the

25   complaint in this case for failure to establish

SANDERS, GALE & RUSSELL
1-800-824-4541

14

1    damages, and I'll ask that this deposition be busted

2    because the witness is not cooperating, I'll move

3    for sanctions against you, and I'll seek to strike

4    the complaint.  That's the proper recourse, Attorney

5    Faulkner, when a witness fails to answer a proper

6    question put to him.

7                    Chase is entitled to probe the

8    damages claimed against it in this case.  I'm

9    entitled to ask this witness to elaborate what those

10   damages are, whether they have been stated in

11   written form or not, because that goes to his

12   credibility, Attorney Faulkner, and it goes to the

13   claims against a defendant in this case, and Chase

14   has the constitutional right to protect itself in

15   this case.

16                    MS. FAULKNER:  Okay.  The deposition

17   is over.  Thank you.

18                    MR. STAGG:  Are you ending this

19   deposition?

20                    MS. FAULKNER:  Yes, we are ending the

21   deposition.

22                    MR. STAGG:  And what is the basis, so

23   that the record is clear?

24                    MS. FAULKNER:  Oppressive, harassing,

25   threatening, erroneous statements of law to

SANDERS, GALE & RUSSELL
1-800-824-4541

1    misrepresent to my client.

2                    If you want to ask actual, nonlegal

3    questions, you may do so.  You may not ask him legal

4    questions, you may not ask him broad questions, and

5    you may not ask him questions that he has already

6    answered in discovery.

7                    MR. STAGG:  I disagree with your

8    position with respect to what I may or may not ask

9    him.

10                    MS. FAULKNER:  Mr. Rota, do you want

11    to take your part of the deposition?

12                    MR. STAGG:  I'm not finished.  I'm

13    not finished, Attorney Faulkner, and I traveled to

14    New Haven today to take this deposition, and I'm

15    entitled to probe this witness with regard to his

16    claims against the bank.

17        Q.    Do you understand what I mean by damages,

18    sir?

19                    MS. FAULKNER:  That is a legal

20    question.  "Damages" encompasses legal response.

21    You may ask him for actual facts.

22        Q.    Have you suffered harm, sir, as a result

23    of the allegations that you claim in this case?

24        A.    Yes.

25        Q.    What harm, sir, have you suffered?

SANDERS, GALE & RUSSELL
1-800-824-4541

16

1      A.      (No response.)

2      Q.      And I would ask that you limit your

3   response solely to the claims against Chase.

4      A.      I don't know how at this point, because I

5   don't have a legal mind, to differentiate between,

6   fully, the damages between Chase and Experian.  I

7   think that they are merged.  I think both have

8   shared a part in the harm that's been done to me

9   through the course of three years.

10     Q.      Is it your testimony, sir, that you cannot

11  separate the damages or the harm that you allege

12  specifically to Chase?

13     A.      Mr. Stagg, that's absolutely correct, that

14  I cannot differentiate, because it seems that Chase

15  and Experian cannot differentiate between my Social

16  Security number and that of another individual, so

17  it's difficult for me to differentiate between who

18  is more responsible for what damages.  I only know

19  as an individual, without a legal mind, that I have

20  suffered damages as a result of this, many very

21  real, some supposed, and I have lived in a nightmare

22  for three full years.

23     Q.      You use the word "damages," sir.  What do

24  you mean by damages?

25     A.      Emotional, the relationship with my wife,

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

17

1 the lack of time that I have been able to spend with

2 my young teenaged son, loss of free time, worrying

3 if my federal agents would surround my house because

4 of erroneous information relating to federal tax

5 liens in an alias of another individual that was

6 shown on my credit reports.  That was a real fear.

7 I truly believed that I could come home some evening

8 and find that they were going to take my house away.

9 Working very often six days a week, coming home at

10 10:30 in the evening, taking a plate and sitting

11 down at my desk and working on this project

12 endlessly, simply trying to get someone from

13 either/and or both Chase and Experian to rectify,

14 simply rectify a wrong that was done to me.

15   My only purpose through the first year and

16 a half of this process was to simply gain back what

17 was rightfully mine, and that was my good credit.

18 That was an unblemished credit report.  That was an

19 expectation of Chase Manhattan Bank to take a

20 customer, their customer, and do the right thing,

21 and it was not.

22 Q. Sir, you say, don't you, that the dispute

23 in this case arose from a typographical error,

24 right?

25   MS. FAULKNER:  Objection.  That's

SANDERS, GALE & RUSSELL
1-800-824-4541

18

1  putting words in his mouth which he never said.

2      Q.    Sir, I show you what's been marked as

3  Chapman Exhibit 4 for identification, and I refer

4  you to the first paragraph, sir, wherein you state,

5  "It is quite upsetting to think that all this

6  happened because of a typographical error."

7           Do you recognize that?

8      A.    Yes.

9      Q.    That's your letter, right --

10     A.    Yes, sir, it is.

11     Q.    -- dated March 20, 2001, to Experian?

12     A.    Yes, sir.

13     Q.    And that's your signature on the third

14  page?

15     A.    Yes, it is, sir.

16     Q.    It was upsetting to you that this came

17  about because of a typographical error, right?

18     A.    Yes.

19     Q.    Let's talk about your emotional distress

20  or damages.  Did you see a doctor in connection with

21  any of the emotional distress that you related to?

22     A.    No, sir.

23     Q.    Did you see anybody, any counselor?

24     A.    No.  I believe when you approach 50 years

25  old, and if you have the stock that I believe that I

SANDERS, GALE & RUSSELL
1-800-824-4541

1    have, I had no time nor could I allow myself to fall

2    into a prison of depression enough so that I could

3    not carry on and take care of my responsibilities

4    and fight this thing and get it resolved.

5        Q.   So you didn't suffer depression as a

6    result of this?

7        A.   Sure I did.  Not all people that suffer

8    depression or forms of it find themselves

9    institutionalized or under a doctor's care.

10            The ills that I suffered were real.  The

11   ills that I suffered were daily, the pending threat

12   of what may happen, the corrections that took place

13   that then somehow disintegrated and reappeared, the

14   amount of work, focus that I had to have at 12:00

15   midnight because I worked all day, it caused me

16   sleepless nights, it caused me lack of time with my

17   family, lack of free time, lack of dinners out with

18   my wife.  It caused me an estranged situation with

19   my wife for the first time; constant grief through a

20   three-year period.

21       Q.   Yet at no time did you seek the assistance

22   or care of a medical provider in connection with the

23   depression?

24       A.   No.  I will tell you, Mr. Stagg, that I

25   did go to my doctor because of -- I came down with

SANDERS, GALE & RUSSELL
1-800-824-4541

20

1    what I thought was arthritic or bursitis, terrible

2    joint aches and pains, and I was prescribed a

3    medication called Bextra for that during this period

4    of time, and although arthritis was never confirmed,

5    it was said to me that it could very well be stress

6    related, and during the last 12 months that has

7    somewhat dissipated because I feel now that I have

8    someone working on my behalf, and I'm not totally

9    alone in this thing, fighting two Goliaths.

10        Q.    What doctor did you see?  Which doctor?

11        A.    Dr. Gary Bergman, Montauck Avenue,

12    M-O-N-T-A-U-C-K, Avenue, New London, Connecticut

13    06320.

14        Q.    When was that?

15        A.    I can't give you the exact date, sir.

16        Q.    Can you approximate a month, a year?

17        A.    I can tell you that it was within the last

18    three years.  Couple of years ago.

19        Q.    It's 2004 now, so approximately 2002?

20        A.    Mr. Stagg, I'm telling you that I don't

21    know specifically when.  I can tell you that it

22    wasn't before the timeline of the three years when

23    this began.  My best guess to you, sir, is that it

24    was about two years ago.

25        Q.    And did this doctor at any time tell you

SANDERS, GALE & RUSSELL
1-800-824-4541

1   that the stress that you were suffering under was

2   related to the claims or disputed issue with regard

3   to Chase?

4       A.    No, sir.  He was not aware of the

5   disputes, and I doubt if my medical doctor would

6   make the assumption that Chase Manhattan Bank was

7   specifically the cause of my ills, no.  I think that

8   that would have to be an assumption as to the

9   persistent and consistent damage and stress that I

10  was under as a result of the actions of Chase

11  Manhattan Bank and Experian.

12      Q.    At any time did federal agents surround

13  your house, sir?

14      A.    No, they did not.  I was fortunate in that

15  regard, sir.

16      Q.    At any time was your house taken away from

17  you?

18      A.    No, sir.

19      Q.    With respect to the Chase account at issue

20  in this case, how was that account opened?

21      A.    It was a solicitation, and if I remember

22  correctly, the interest rate that was, because of my

23  impeccable credit history, I was offered a very,

24  very low rate, and I can't recall what that rate

25  was.  It might have been 2 or 3 percent; and again,

SANDERS, GALE & RUSSELL
1-800-824-4541

22

1    I say that might have been because I don't recall

2    the exact rate.

3         So my wife, Elaine Chapman, handles all of

4    our financial matters at home, and I'm certain that

5    she would have mentioned this rate and decided that

6    we should open that account.

7    Q.    Do you remember when you opened the Chase

8    account at issue in this case?

9    A.    It was in the year 2000, sir.  I don't

10   remember the month.  It was 2000.

11   Q.    And what type of solicitation was it?  Was

12   it phone?  Was it mailed to you?

13   A.    I can't tell you with 100 percent

14   certainty, but I believe that it was a mailed

15   solicitation.

16   Q.    That you completed and sent back to Chase?

17   A.    My wife may have completed it, with my

18   signature.

19   Q.    Did you sign it or did she sign it?

20   A.    I would always sign it.  She would not

21   have signed my signature.

22   Q.    So to the best of your recollection, you

23   received a mail solicitation from Chase that you

24   sent back to open the account?

25   A.    To the best of my recollection.  Now, it's

23

1  possible that it was done over the telephone.  I

2  simply don't remember.  It was not something at the

3  time, Mr. Stagg, that would have caused me to burn

4  that portion of it in my memory.  It was the

5  resulting effects that have been burned in my

6  memory.

7      Q.    Do you have any documents that would

8  indicate whether it was a mail or telephone

9  solicitation?

10      A.    I'm not in the habit, Mr. Stagg, of saving

11  that kind of thing.  If it's successfully opened, if

12  an account is successfully opened, that would have

13  been disposed of.  Those are not documents to me

14  that, like a home mortgage or insurance papers.  It

15  would be something that was simply solicited.  If I

16  agreed to it, I opened it, and I would probably

17  dispose of those papers.

18      Q.    Would your wife be in a better position to

19  know how the account was opened?

20      A.    Certainly.

21          I'm sorry.  Would you repeat -- would my

22  wife be?  I'm sorry, sir.  I misunderstood the

23  question.  I thought you said would I like to be

24  made aware of how the account was opened.

25          No.  I've discussed this with my wife, and

SANDERS, GALE & RUSSELL
1-800-824-4541

24

1    she does not recall.

2       Q.    Let's go back to the damages that you

3    allege for embarrassment.  Are there any documents

4    that you have that would indicate the embarrassment

5    you claim you suffered?

6       A.    I don't know, Mr. Stagg, how you document

7    embarrassment, humiliation, threat.  I don't know.

8    I'm trying to think of any circumstance where there

9    would be documentation of those things.

10          I can tell you that when I went to

11   purchase a car in the month of March of 2001 this

12   was a happy occasion with my wife at my side, my

13   then 13-year-old son, excited about getting our new

14   vehicle, and I was told by the credit manager in

15   front of my vulnerable 13-year-old son, I was

16   questioned and asked if I had an alias, if I had

17   ever gone by an alias, if I was in the habit of

18   using more than my name, if I had ever gone by the

19   name of John C. Solberg, questioned my federal tax

20   lien in the state of Oregon; but after a 20 or

21   30-minute display of this erroneous information,

22   this credit manager smiled and said, "But your good

23   credit has superseded some of these bad things, so

24   we are still going to give you the car," which left

25   my -- I'll never forget the expression on my

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

1    13-year-old son's face.  I certainly will tell you

2    that it kind of dampened the evening and the

3    occasion of getting a new vehicle.  That's how it

4    began.

5           From that point, from that point I spent

6    19 months, and that's an accurate accounting --

7    Q.    Sir, I just ask that you respond to my

8    question, rather than give narrative answers.

9    You're entitled to elaborate on any answer that you

10   give.  I don't want to cut you off, but my question

11   to you was, do you have documents that would support

12   your claim that you suffered embarrassment.

13   A.    I have no documents, sir, no.

14   Q.    Let's talk about the auto finance

15   transaction.  That was a Honda dealership?

16   A.    Yes.

17   Q.    You received financing from Honda, right?

18   A.    Yes, sir.

19   Q.    So it was 20 minutes of embarrassment that

20   you suffered at that Honda dealership before the --

21   A.    It was 20 minutes that revealed the reason

22   why I would continue to be embarrassed for three

23   years.

24   Q.    And what reason was that?

25   A.    Because there was a federal tax lien on my

SANDERS, GALE & RUSSELL
1-800-824-4541

26

1    credit report, an alias, and a battery of different

2    erroneous credit information and accounts, and

3    inquiries that were not mine.

4        Q.    And how do you relate that to Chase?

5        A.    Because upon discovery that it was Chase's

6    error and my persistent plea to get this information

7    corrected, and it was not, I hold Chase accountable

8    for that.

9        Q.    You don't know, though, sir, as you sit

10    here today, do you, that at the time the account was

11    opened that you may have given an incorrect Social

12    Security number or Chase may have, as a result of a

13    faulty telephone connection, may have, or a garbled

14    telephone connection, may have misunderstood your

15    Social Security number, right?

16        A.    I cannot tell you if the person that

17    received the call had static on his or her telephone

18    line, but I can assuredly tell you, sir, that I have

19    had my Social Security number from the age of 16,

20    and that there was no error in my recounting the

21    digits of my Social Security number that I have used

22    repeatedly through 35 years.

23        Q.    But it's possible, isn't it, sir, that it

24    may have been --

25        A.    No, sir.

1    Q.    Listen to my question, please.  It's

2    possible, sir, that the representative from Chase on

3    the other end of the telephone line, if this in fact

4    were a telephone solicitation, may have taken down

5    the wrong Social Security number simply because

6    there wasn't a clear connection, right?

7            MS. FAULKNER:  Objection.  Calls for

8    speculation.

9    Q.    Right?

10   A.    I believe it is -- your question is based

11   purely on speculation.  I can't tell if lightning

12   came down and struck the phone line that I wasn't

13   aware of, and therefore interfered with a clerk's

14   ability to hear, Mr. Stagg.

15   Q.    And you can't tell me, can you, sir, how

16   it was that the Social Security number listed for

17   you in Chase's records was off by one digit, right?

18   A.    Please repeat the question, Mr. Stagg.

19   I'm sorry.

20   Q.    You can't tell me as you sit here today

21   how it was that the wrong Social Security number was

22   listed for you in Chase's records, right?  You don't

23   know how that happened?

24   A.    Well, I had an employee, an employee of

25   Chase by the name of Domingo -- please, I'm not

SANDERS, GALE & RUSSELL
1-800-824-4541

1    certain on the last name; it's in the record; I

2    think it was Morales -- completely identified the

3    computer data, and this is all in my answers,

4    indicated that he saw clearly that my Social

5    Security number and that of a Mr. John Solberg had

6    been mismerged, and that it was, in fact, a Chase

7    error.

8            I also believe that the Chase letters that

9    we have looked at earlier have indicated an apology

10   relating to pretty much the same.

11       Q.    But you don't know how it came about that

12   your Social Security number was incorrectly listed

13   in Chase's records, right?

14       A.    That's correct, sir, I do not know exactly

15   how that might have transpired.

16       Q.    And based on the records we looked at --

17   why don't you go through them and tell me if there's

18   anything there indicating how that error came about.

19       A.    No.   In my answer, and with the name, the

20   phone number, and even the extension number of the

21   individual that reiterated this process to me, I

22   would think would be -- it certainly was enough

23   proof for me to believe when he only knew my name

24   and my correct Social Security number, and after I

25   spoke and told him about the circumstance, he was

SANDERS, GALE & RUSSELL
1-800-824-4541

29

1    able to bring up on his computer screen the entire

2    synopsis of what had happened, that was certainly

3    good enough for me.

4        Q.    Except how this error came about, right?

5              MS. FAULKNER:  You're asking an awful

6    lot of repetitious and meaningless questions.  So

7    why don't we stop harassing the witness and get on

8    to something you really want to know about.

9              MR. STAGG:  Objection to your

10   mischaracterization.

11       Q.    I want to know, sir, based on your

12   testimony --

13             MS. FAULKNER:  Would you get the

14   smirk off your face when you're asking my client

15   questions.

16             MR. STAGG:  First of all, don't

17   mischaracterize my presentation, okay, and you're

18   doing that, Attorney Faulkner.

19             MS. FAULKNER:  I am not.

20             MR. STAGG:  Yes, you are.  I'm asking

21   your witness a question, and he has given various

22   answers, and I'd like clarification with respect to

23   whether he has any proof whatsoever as to how this

24   error came about.

25       Q.    Do you understand what I'm looking for,

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

1  sir?

2      A.    I do.

3              MS. FAULKNER:  He's not the one --

4  that's a legal question.  He is not the one that

5  worries about proof.  I am the one that worries

6  about proof.

7              MR. STAGG:  So am I.

8      Q.    Do you understand my question, sir?

9      A.    I do.

10             I do not have definitive proof of how the

11  clerk that's employed by Chase made specifically the

12  error that caused me three years of hell.  No, sir,

13  I don't.

14     Q.    And you're assuming, sir, that it was made

15  by Chase, correct?

16     A.    No, no, sir, I'm not assuming.  I'm going

17  by a Chase employee that told me very specific

18  information and admitted it, and you, sir, in your

19  records have his name, phone number, even his

20  extension number.

21     Q.    And what did he admit specifically?

22     A.    Specifically, he said "Oh, I see it

23  clearly.  Your Social Security number was punched in

24  one digit, the first digit, incorrectly, and that

25  has caused your account to be," I don't believe he

SANDERS, GALE & RUSSELL
1-800-824-4541

31

1    used the word "mismerged," but that's my word,

2    "mismerged with that of another individual," and I

3    believe I said, "Is that other individual John C.

4    Solberg," and I believe that he confirmed that as

5    well.

6        Q.    My question to you, sir, doesn't pertain

7    to whether an error was made.  It pertains

8    specifically as to how that error was made, and --

9            MS. FAULKNER:  And you asked it

10   several times.

11       Q.    -- my question to you was, you assumed

12   that Chase made the error initially, correct?

13       A.    Initially?  I'm finding the word

14   "initially" confusing, Mr. Stagg.  Initially I did

15   not know that Chase was involved at all.  It wasn't

16   until November of 2002 that I found out that Chase

17   had made the error.  When I talked to the employee

18   at Chase, he admitted making the error.  He did not

19   tell me specifics as to how that error was done.

20       Q.    What error did he admit to?

21       A.    That the first digit of my Social Security

22   number was misentered into their computer system, so

23   I would assume if it was their computer system,

24   meaning Chase's computer system, that it wasn't an

25   outside person that entered it, that it was an

SANDERS, GALE & RUSSELL
1-800-824-4541

32

1    employee of Chase Manhattan Bank.

2        Q.    Thank you.

3              Sir, at paragraph 4 of Plaintiff's

4    Response To Interrogatories, the question put was,

5    "Identify all damages plaintiff is claiming in this

6    action, and identify each document relating to such

7    damages."

8              There was an objection interposed, I

9    assume by your attorney, but it goes on to say,

10   "With regard to Chase, actual damages for

11   embarrassment, humiliation, inconvenience, injury to

12   credit reputation, out-of-pocket costs for mail,

13   telephone, copy of credit reports, statutory damages

14   pursuant to ECOA, punitive damages pursuant to

15   CUTPA," period.  "No documents."

16             Is it fair to say, sir, then, that you

17   have no documents supporting any of the actual

18   damages you reference in paragraph 4?

19       A.    I have expense-related documents.  Could

20   you dissect that a bit, Mr. Stagg, and ask me, ask

21   me a couple of questions, but more specifically?

22       Q.    Certainly.  We have already established,

23   haven't we, sir, that you have no documents showing

24   the embarrassment you claim to have suffered, right?

25       A.    That's correct.

SANDERS, GALE & RUSSELL
1-800-824-4541

33

1    Q.    And you have no documents referencing the

2    humiliation that you claim to have suffered, right?

3    A.    That's correct, sir.

4    Q.    According to this paragraph, it's true,

5    then, that you have no documents supporting the

6    inconvenience that you suffered, right?

7    A.    Unless -- you see, I'm having a hard time.

8    I'm having difficulty thinking of any circumstance

9    in life in any way where one who has been harmed and

10   suffered humility, inconvenience, and damages of any

11   kind, is handed a document that shows that.  I think

12   the documents that lead up to this case, lead up to

13   us being here today, is the documented proof that

14   you're looking for, Mr. Stagg.

15   Q.    Sir, I'd like you to take a look at the

16   last page of Plaintiff's Response To

17   Interrogatories.  That's your signature there on the

18   verification page, right?

19   A.    It is, sir.

20   Q.    Read what that verification states in the

21   first sentence.

22   A.    "The undersigned states that the facts

23   stated in the responses to the interrogatories are

24   true to the best of my knowledge and belief."

25   Q.    That's all, just that first sentence.  And

1   that's your signature on that page?

2      A.    Yes.

3      Q.    And that was signed on May 30, 2003?

4      A.    Correct.

5      Q.    And you reviewed these responses to

6   interrogatories before you signed them, right?

7      A.    Yes.

8      Q.    And at the time you signed them you

9   understood what they meant, right, because you

10  wouldn't have signed them otherwise?

11     A.    I understood them without the legal

12  portions of it.

13     Q.    Let's -- perhaps we can do this in a more

14  efficient manner, and I certainly don't want to

15  belabor the point.  Why don't you tell me what

16  documents, if any, that you've located since you

17  responded to these interrogatories on May 30, 2003,

18  that would support any of the claims for actual

19  damages in that paragraph.

20     A.    Mr. Stagg, can you give me a more

21  specific?  Which item are we referring to?

22     Q.    Any and all of them, sir.  Paragraph 4.

23     A.    Paragraph 4.

24     Q.    Do you see where it states -- let me help

25  you.  Page 5, sir.

SANDERS, GALE & RUSSELL
1-800-824-4541

35

```
 1      A.    Starting --

 2      Q.    Paragraph 4, where it states, "With regard

 3    to Chase," and then it goes on to say, "actual

 4    damages," and "damages" is the language that you

 5    used.

 6            MS. FAULKNER:  No, it's the language

 7    that his attorney used.

 8            MR. STAGG:  Oh, that you used.

 9            MS. FAULKNER:  Yes, that's correct.

10            MR. STAGG:  Perhaps you'd like to

11    withdraw your earlier objection with regard to the

12    use of that phrase.

13            MS. FAULKNER:  That was my objection,

14    that the attorney used the phrase in response to

15    your attorney's question using the phrase.

16            MR. STAGG:  And your client signed

17    this document, right?

18            MS. FAULKNER:  And the client signed

19    the document, specifically saying, "As to legal

20    contentions and analysis I have no personal

21    knowledge, but I rely upon counsel, discovery as to

22    the underlying facts of the case, and not to the

23    responses of interrogatories," and these questions

24    are way out of bounds.

25            MR. STAGG:  I disagree completely,
```

SANDERS, GALE & RUSSELL
1-800-824-4541

36

1    but let's get on with it.

2        A.    I'm sorry, I've lost -- would you repeat

3    the question that you are looking for, Mr. Stagg.

4        Q.    Sure.  As I understand the response to

5    this interrogatory, sir, there are no documents to

6    support the claim for actual damages relating to

7    embarrassment, humiliation, inconvenience, injury to

8    credit reputation, out-of-pocket costs for mail,

9    telephone, copy of credit reports.

10            Is that still the case today, sir?

11       A.    I thought that I had answered that with my

12   last statement.  I don't know, Mr. Stagg, how one

13   assembles documentation of ills that are imposed

14   upon them.  The documentation seems to me to be

15   within the paperwork that lies on this table.  In

16   the letters that show the damage, the reason for the

17   damage, the apology letter, and then the letter that

18   reduces my credit line, then an apology letter,

19   those kinds of things are my documentation.  I don't

20   think that one goes through this type of thing

21   unscathed or unblemished, or undamaged, or without

22   being hurt.  That's my statement.

23       Q.    I don't want your statement, sir.  I want

24   a response to my question.  Please answer my

25   question.

SANDERS, GALE & RUSSELL
1-800-824-4541

1      A.    I just gave it to you, Mr. Stagg, I

2  thought.

3            MS. FAULKNER:  That's enough.  You

4  gave it to him.

5      Q.    So you have no documents as you sit here

6  today that would support any claim for

7  embarrassment, humiliation, inconvenience, injury to

8  credit reputation, out-of-pocket costs for mail,

9  telephone, or copy of credit reports, right?

10     A.    All of the papers that are on this table,

11  Mr. Stagg.

12     Q.    Point to the papers, sir, specifically and

13  the paragraphs.

14            MS. FAULKNER:  That is enough of

15  this.  That is enough.  I'm not going to stand for

16  this harassment.  He has answered this question four

17  times.

18            MR. STAGG:  No, he hasn't.  He has

19  pointed to documents on this table.  I'd like him to

20  point to the specific words in the documents on this

21  table.

22     Q.    Now, if you would do that, sir, I would be

23  most in your debt.

24            MS. FAULKNER:  Thank you.

25            Mr. Rota, do you want to take your

SANDERS, GALE & RUSSELL
1-800-824-4541

38

1  part of the deposition?

2              MR. STAGG:  I'm not done.

3              MS. FAULKNER:  You're done.

4              MR. ROTA:  Mr. Stagg has the floor.

5  You'll have to work this out.

6              MR. STAGG:  I'm not done.  Just so

7  the record is clear, Attorney Faulkner, you are

8  breaking up this deposition because you won't allow

9  your witness to answer questions relating to

10  documents that he claims show his damages in this

11  case?  I want an understanding of where --

12              MS. FAULKNER:  I'm breaking up this

13  deposition because you are harassing him, you are

14  oppressing him.  You have asked him the same thing

15  five times.  You have looked at him with a snear on

16  your face, and I don't think we need to tolerate

17  this.  Thank you.

18              Mr. Rota, would you want to go ahead?

19              MR. ROTA:  I want to take my

20  deposition while we are here, but Mr. Stagg does

21  have the floor right now.

22              MS. FAULKNER:  We are done with

23  Mr. Stagg.

24              MR. STAGG:  No, Attorney Faulkner, we

25  are not.

SANDERS, GALE & RUSSELL
1-800-824-4541

1              Let the record reflect that you have

2    glared at me throughout this deposition with hateful

3    glances that are totally unprofessional.  I have

4    never once smirked or done anything unprofessional

5    with respect to this witness, and I am entitled to

6    answers to the questions I've put to this witness,

7    and if you walk out of this deposition, Attorney

8    Faulkner, I will ask the court to dismiss this case

9    for failure to establish damages.

10             MS. FAULKNER:  That was a very nice

11   speech, most of which was untrue.  However, let me

12   say that all you have done is gone over documents

13   that you have already had and answers that you have

14   already had.  If you had something new that you

15   wanted to ask him, there would be some purpose in

16   this deposition, but right now there is no purpose

17   except oppression and harassment.  If you have

18   something you want to go on to, other than the same

19   question five times --

20             MR. STAGG:  I strenuously object to

21   your mischaracterization.

22             Your witness, the plaintiff in this

23   case, has claims that there are documents on this

24   table that support his claim for actual damages.

25             MS. FAULKNER:  And he has said what

SANDERS, GALE & RUSSELL
1-800-824-4541

40

1    they were several times.

2                    MR. STAGG:  He has?  No, he hasn't.

3    I would like him to specifically identify which

4    documents he's talking about, because presumably

5    they support his claim.  I'm entitled to probe that.

6                    MS. FAULKNER:  Did you want to go on

7    to another topic or not.

8                    MR. STAGG:  No.  I want an answer to

9    that question.  I have other topics that I will,

10   that I intend to cover, but you're not allowing me

11   to do that.

12                   MS. FAULKNER:  If you want to go on

13   to the other topics, you may at this point.  I see

14   you have five or six folders there with some

15   additional questions.  If you want to ask them, you

16   may.

17                   MR. STAGG:  I'd like to call the

18   court right now and get an immediate ruling on this.

19                   Is there a telephone in this room?

20                   MS. FAULKNER:  The deposition is over

21   and we are leaving.

22                   MR. STAGG:  No, the deposition is not

23   over.  This is my deposition, Attorney Faulkner, and

24   it's not over, and we are staying on the record,

25   with or without you and your witness.

SANDERS, GALE & RUSSELL
1-800-824-4541

```
 1                    (In the absence of Ms. Faulkner and

 2          Mr. Chapman:)

 3                    MR. STAGG:  Why don't we go off for

 4   one minute while we get Judge Hall's telephone

 5   number.

 6                    THE VIDEOGRAPHER:  Going off record

 7   at 11:01.

 8                    (Recess:  11:01 to 11:06 a.m.)

 9                    THE VIDEOGRAPHER:  We are back on

10   record at 11:06.

11                    MS. FAULKNER:  Let the record reflect

12   that we have a telephone call in to Judge Hall

13   following Attorney Faulkner's busting of the

14   deposition; and so the record is clear, Attorney

15   Faulkner is no longer in the room.

16                    THE CLERK:  (Via telephone)  Attorney

17   Stagg?

18                    MR. STAGG:  Yes.

19                    THE CLERK:  Did you say that

20   plaintiff's counsel walked out of the deposition?

21                    MR. STAGG:  She did.

22                    THE CLERK:  So it's just you calling

23   the court?

24                    MR. STAGG:  No, co-defendant's

25   counsel is here as well.
```

42

1                    THE CLERK:  It would be still be an

2      ex-parte communication because the plaintiff

3      wouldn't be represented on the phone call, would

4      they?

5                    MR. STAGG:  No, but --

6                    THE CLERK:  The judge is not going to

7      handle it that way.  All counsel have to be present

8      before she can make any sort of a ruling with regard

9      to that, and actually she is going out to the bench,

10     and she has suggested that if, in fact, all counsel

11     were present, if, in fact, plaintiff's counsel

12     walked back into the room, that I suggest I would

13     try to hook you up with Judge FitzSimmons because

14     Judge Hall, as I said, is on her way to the bench.

15                   MR. STAGG:  Unfortunately, Attorney

16     Faulkner has not come back.  She's apparently left

17     the building, and taken her witness, the plaintiff

18     in the case, with her.

19                   THE CLERK:  Who was being deposed?

20                   MR. STAGG:  Who was being deposed.

21                   THE CLERK:  Just what is it that you

22     want the court's intervention on, then?

23                   MR. STAGG:  We wanted the court's

24     input and advice as to how to proceed at this

25     juncture, and I understand that this is an unusual

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

43

1    set of circumstances, and we are not attempting an

2    ex-parte communication with the judge.  We are only

3    seeking the judge's input, and perhaps the judge can

4    schedule an immediate conference on this.

5              THE CLERK:  That's what I was just

6    going to suggest to you.  Why don't you put in a

7    letter what obviously occurred today.  You cannot go

8    forward with the deposition without the deponent.

9    If you want to put in the letter what occurred, and

10   then obviously that will bring it to the judge's

11   attention, and make sure you copy Attorney Faulkner

12   and all counsel of record on this, and then more

13   than likely the judge would then at that point set

14   up a telephone conference.

15             MR. STAGG:  We'll do that.  Thank you

16   for your input.  Bye-bye.

17             (Telephone conference concluded.)

18             MR. STAGG:  Let the record reflect

19   that Attorney Faulkner has busted this deposition.

20   She's taken her witness, the plaintiff, John

21   Chapman, away over my objection and I would

22   suppose --

23             MR. ROTA:  My objection also.

24             Mr. STAGG:  -- Experian counsel's

25   objection, and we will seek recourse with Judge

SANDERS, GALE & RUSSELL
1-800-824-4541

44

1    Hall.  Thank you.

2                THE VIDEOGRAPHER:  Going off record

3    at 11:11.

4                (Recess:  11:11 to 11:25 a.m.)

5                THE VIDEOGRAPHER:  We are back on

6    record at 11:25.

7                MR. STAGG:  Are we back on the

8    record?

9                We are back on the record.  I guess

10   it's about ten minutes later, and just so the record

11   is clear, when Attorney Kazin and I left the

12   building, we saw Attorney Faulkner and Mr. Chapman

13   outside.  Thereafter, we came back into the building

14   for the purposes, for the purpose of continuing the

15   deposition if Attorney Faulkner would allow us to do

16   that, and to call Magistrate Judge FitzSimmons for a

17   ruling with respect to the disagreement between

18   counsel.  At that point Attorney Faulkner again

19   walked out of the deposition room with her client

20   and refused to participate in a telephone conference

21   call with Judge FitzSimmons.  I specifically asked

22   her if she would participate, and she did not

23   respond.

24                MR. ROTA:  Could you please also have

25   the record show that Ms. Faulkner asked if I,

SANDERS, GALE & RUSSELL
1-800-824-4541

45

1    Experian counsel, wanted to continue with the

2    deposition, and I said yes, I would like to

3    continue, that it would not be appropriate to

4    continue without Chase counsel being present, and

5    Chase's counsel would have liked to have had Judge

6    FitzSimmons rule on their portion of the deposition.

7                    As this is a single deposition, it is

8    not actually two depositions, it wasn't proper for

9    Ms. Faulkner to leave again.

10                   MR. STAGG:  Attorney Rota, would you

11   agree that the statements that I put on the record

12   were accurate and fair?

13                   MR. ROTA:  Yes, I would.

14                   MR. STAGG:  Thank you.  I have

15   nothing else.

16                   MR. ROTA:  Actually, Mr. Stagg, would

17   you agree that the statements that I put on the

18   record were accurate and fair?

19                   MR. STAGG:  Yes.

20                   THE VIDEOGRAPHER:  Going off record

21   at 11:27.

22                   (Deposition adjourned:  11:27 a.m.)

23

24

25

```
SANDERS, GALE & RUSSELL
1-800-824-4541
```

46

```
 1                    J U R A T

 2

 3

 4

 5              _____

 6                    JOHN J. CHAPMAN

 7

 8

 9         Subscribed and sworn to before me on

10    this _____ day of _____, 2004.

11

12

13

14              _____

15                    Notary Public.

16

17

18    My Commission expires: _____

19

20

21

22

23

24

25
```

SANDERS, GALE & RUSSELL
1-800-824-4541

47

```
 1                        INDEX

 2    WITNESS                                    PAGE

 3    John J. Chapman

 4        Direct Examination by Mr. Stagg           4

 5

 6                       EXHIBITS

 7
      CHAPMAN
 8    EXHIBITS              DESCRIPTION          PAGE

 9    1         Letter, 11/25/02, Arguello to
                Chapman.                          3
10
      2         Letter, 12/25/02, Arena to Chapman.   3
11
      3         Letter, 1/14/03, Magallan to Chapman.  3
12
      4         Copy of Envelope; letter, 3/20/01,
13              Chapman to Experian Complaint
                Department.                       3
14

15

16    Reporter's note:  Original exhibits returned to
      Mr. Stagg.
17

18

19

20

21

22

23

24

25
```

SANDERS, GALE & RUSSELL
1-800-824-4541